IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CASABLANCA LOFTS LLC, | ) | 09 C 04839 |
| | ) | |
| Appellee, | ) | Judge Ronald A. Guzmán |
| | ) | |
| v. | ) | ------------------------------------------------ |
| | ) | |
| RICHARD JAMES ABRHAM, | ) | *Appeal from:* |
| | ) | Adv. Pro. No. 08 A 00971 and |
| Appellant. | ) | Case No. 08 B 27606 |

**MEMORANDUM OPINION AND ORDER**

Appellant Richard James Abrham ("Abrham") has appealed the judgment of the bankruptcy court in which it granted Casablanca Lofts LLC's ("Casablanca") summary judgment motion, denied Abrham's cross-motion and held that Abrham's debt owed to Casablanca was nondischargeable under 11 U.S.C. § ("Section") 523(a)(2)(A). For the reasons provided in this Memorandum Opinion and Order, the Court affirms the decision of the bankruptcy court.

**Procedural History**

In 2005, Casablanca brought an arbitration proceeding against Abrham and co-defendant DWG Construction, Inc. ("DWG"). (R., Attach. 1, Doc. 1-1, at 70-87.) The arbitration panel held that DWG was liable for breach of contract and fraud and Abrham was liable as a partner of DWG as well as individually for his negligent misrepresentations and contract breaches. (*Id.* at 84-85.) The arbitration panel found Abrham and DWG jointly and severally liable to Casablanca in the amount of $1,469,520.61. (*Id.* at 84.) A state court affirmed the award. (R., Attach. 3, Doc. 1-3, at 78.) The judgment was among the debts scheduled by Abrham when he

1

filed a voluntary petition for relief under Chapter 7 of Title 11 of the U.S. Bankruptcy Code on October 15, 2008 in the U.S. Bankruptcy Court for the Northern District of Illinois. (R. at 34.) On November 26, 2008, Casablanca filed an adversary complaint seeking a finding of nondischargebaility of the debt owed to it by Abrham as a result of the arbitration award. (R. at 74-84.) The parties filed cross-motions for summary judgment, and the Honorable Carol A. Doyle granted Casablanca's motion and denied Abrham's motion. (R., Attach. 3, Doc. 1-3, at 77.) Abrham appealed. (R. at 2.)

## Statement of Facts

In their cross-motions for summary judgment filed in the bankruptcy court, Casablanca and Abrham stipulated to be bound by the arbitration panel's findings of fact and conclusions of law. (R., Attach. 3, Doc. 1-3, at 58.) The dispute at issue arose from the improvement of a warehouse located at 1736 S. Michigan Avenue in Chicago, Illinois ("the project"). (*Id.* at 59.) Abrham, a licensed Illinois architect, Daniel Hernandez, an interior designer, and DWG, a general contractor, formed a partnership ("the GC Team") to bid on and complete the project. (*Id.* at 60.) Under the partnership agreement, Abrham provided architectural services and acted as "Inspecting Architect," Hernandez provided interior design and construction services and DWG assumed all other general construction responsibilities. (*Id.* at 61.)

On December 4, 2003 Casablanca, DWG, Hernandez and Abrham agreed in writing to a standard AIA General Contract ("the agreement"). (R., Attach. 1, Doc. 1-1, at 2-42.) According to the agreement, DWG agreed to substantially complete the project by March 30, 2005 for $4,950,965.00 plus extras and less credits. (R., Attach. 3, Doc. 1-3, at 60.) All parties involved

2

understood that as the "GC Team," Abrham and Hernandez would assist DWG in performing its obligations under the agreement. (*Id.*) Abrham, DWG and Hernandez agreed to share profits equally, and they shared $60,000.00 of the deposit paid by Casablanca after it entered the agreement without disclosing to Casablanca that part of the deposit would be used for this purpose. (*Id.* at 60-61.)

As the project progressed in 2004, the parties began to dispute various issues such as work quality, progress, change orders and DWG's use of funds that were initially received for the project. (*Id.* at 62.) Prior to the execution of the agreement, no party made any false representation of material fact. (*Id.*) However, the general conditions of the agreement required DWG to maintain and follow a schedule throughout the project, which it failed to do. (*Id.*) Because there was no working schedule, it was difficult to measure progress, but DWG only once mentioned that it was behind schedule despite numerous delays. (*Id.* at 63-64.)

The general contracting team made several misrepresentations throughout its performance of its obligations. First, it requested a deposit of $385,000.00 and claimed $64,000.00 of the deposit was needed to acquire a favorable price on hardwood flooring. (*Id.* at 64.) However, the money was never allocated or used to acquire the hardwood flooring. (*Id.*) Additionally, DWG represented that $20,000.00 of the deposit was for a deposit on an elevator, although it was never used for that purpose. (*Id.*) In both instances, lien waivers were falsely provided and submitted to the title company as proof that the deposits were made. (*Id.*) Also, DWG paid its demolition subcontractor $225,000.00 from the initial deposit but only reported to the title company that it paid him $168,000.00. (*Id.*) Further, the payout applications, which

3

were signed by DWG and certified by Abrham, inaccurately reported the overall progress of the project. (*Id.* at 64-65.)

On September 28, 2004, Abrham informed Casablanca that the relocation of the elevator and color selection of the elevator's panel was holding up production. (*Id.* at 65.) However, All Types Elevator informed Casablanca in November that the elevator was never in production because the deposit was not received. (*Id.*)

On November 10, 2004, Casablanca demanded that the hardwood flooring either be delivered or that the deposit be refunded. (*Id.*) On November 23, 2004, the general contracting team assured Casablanca that the flooring had been purchased and identified the type of flooring but admitted after the termination of the agreement that it was never purchased. (*Id.*) DWG also represented that ANE, the initial electrical subcontractor, had completed 33% of the electrical work when less than 15% had been completed. (*Id.* at 66.) ANE was also paid $135,000.00, although it had completed only $19,000.00 worth of work. (*Id.*)

The parties also agreed to reduce the contract by $100,000.00 by allowing a portion of the restaurant equipment to come from the $1,000,000.00 budget for the restaurant, but DWG never paid this amount to Casablanca. (*Id.* at 66-67.) Additionally, DWG failed to install the type of furnace required by the agreement. (*Id.* at 65-66.) DWG also used a gauge of C-channel structural framing for the third floor mezzanine support system that was thinner than the type required by the contract. (*Id.* at 67.) Further, Abrham and DWG changed the blueprints of the building, but they refused to provide them to Casablanca unless it approved a number of change orders that the arbitration panel held were without merit. (*Id.*)

On December 7, 2004, Casablanca terminated the agreement for cause in a letter sent to DWG and Abrham. (*Id.* at 62.) At that time, Casablanca had not been informed as to when the project would be completed although it was at least several months late. (*Id.* at 68.) Further, the reasonable cost of completion was $7,173,695.00. (*Id.*) The ultimate cost to Casablanca was substantially greater, but it did not meet its burden of showing that DWG and Abrham should be responsible for other additional costs. (*Id.*) This estimate includes what Casablanca already paid to DWG, the cost of settling pending obligations and the amount to pay another company to complete the work. (*Id.*) The estimate also takes in account overpayments including deposits for the elevator and flooring, most of the ANE payments and part of the payment to DWG's demolition subcontractor. (*Id.*)

The arbitration panel found that DWG had committed fraud and was liable to Casablanca in the amount of $1,469,520.61. (*Id.* at 73-74 (stating that DWG . . . committed fraud . . . but the resulting damages are the same as, and do not increase, the amounts set forth").) The panel also found Abrham liable to Casablanca, both as a formal partner of DWG and individually, because his negligent misrepresentations and contract breaches substantially contributed to the damages. (*Id.* at 74.) Thus, the panel found Abrham and DWG jointly and severally liable to Casablanca. (R., Attach. 1, Doc. 1-1, at 84.)

## Discussion

The Court reviews the bankruptcy court's factual findings with regard to dischargeability of a debt for clear error and conclusions of law and mixed questions of law and fact de novo. *In*

5

*re Bonnett*, 895 F.2d 1155, 1157 (7th Cir. 1989); *see In re Ratner*, 132 B.R. 728, 730 (N.D. Ill. 1991). Abrham and Casablanca signed and filed a stipulation with the bankruptcy court that both parties are "bound by the Findings of Fact, Conclusions of Law and Arbitration Award . . . . as if the same factual and legal issues were actually litigated in this case." (R., Attach. 3, Doc. 1-3, at 77.)

Abrham argues that the bankruptcy court erred in concluding that Casablanca's damages (*i.e.*, Abrham's debt) were caused by DWG's fraud, rather than a material breach of the contract.[1] The Court disagrees. The arbitration panel's conclusions of law, which Abrham has stipulated govern this bankruptcy case, clearly state that Abrham's partner, DWG, committed fraud, which means that the debt Abrham incurred as a partner of DWG is attributable to DWG's fraud. (*Id.* at 85.) Given the facts as stipulated, the Court holds that Casablanca has established by a preponderance of the evidence, see *Grogan v. Garner*, 498 U.S. 279, 286 (1991), that Abrham's formal partner, DWG, intentionally made false representations to Casablanca and that Casablanca justifiably relied on them, see *Field v. Mans*, 516 U.S. 59, 74-75 (1995). That the arbitration panel found that the amount of damages caused by DWG's fraud did not increase the damages caused by DWG and Abrham's breach of contract and Abrham's negligence does not mean that Casablanca's damages (*i.e.*, Abrham's debt) were not caused by DWG's fraud. Because fraud victims, such as Casablanca, are entitled to recover out-of-pocket expenses in order to be placed in the same financial condition had there been no fraud, *Brown v. Broadway*

---

[1] The Court holds that Abrham's first four appellate issues are based on his assumption that the arbitration panel's judgment and award of damages were not based on fraud, but rather, solely on breach of contract. (*See* Appellant's Br. 1, 6-11 (addressing first four appellate issues as one issue in his brief).) Accordingly, the Court holds that the same analysis applies equally to these issues.

*Perryville Lumber Co.,* 508 N.E.2d 1170, 1176 (Ill. App. Ct. 1987), the damages that the arbitration panel awarded, and the state court affirmed, for cost of completion, delay, interest and taxable costs are damages necessarily resulting from fraud. *See Cohen v. de la Cruz*, 523 U.S. 213, 218, (1998) (holding that any debt arising from the debtor's fraud is excepted from discharge); *In re McFarland*, 84 F.3d 943, 947 (7th Cir. 1996) (holding that the entire amount of obligation tainted by fraud is excepted from discharge, not merely the additional money extended in reliance upon the debtor's fraud). Accordingly, the Court holds that the bankruptcy court correctly held that Abrham's debt was for money obtained by DWG's fraud.

Abrham also argues that the bankruptcy court erred in imputing DWG's fraud to him such that his debt arising from Casablanca's judgment against him is nondischargeable. It is undisputed that Abrham acted merely negligently, not fraudulently like Abrham's partner, DWG. Therefore, the issue squarely presented in this case is whether an innocent (*i.e.*, not knowing, reckless or fraudulent) partner's debt incurred due to the fraud of his partner fits within the exception to discharge under Section 523(a)(2)(A). Although courts in this circuit have addressed the fraud exception to discharge with regard to a debtor's own fraud, *see, e.g.*, *Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 673-75 (7th Cir. 1995), *Gabellini v. Rega*, 724 F.2d 579, 580-81 (7th Cir. 1984), *Carini v. Matera*, 592 F.2d 378, 380 (7th Cir. 1979), the issue presented in the instant case is one of first impression in this circuit.

Section 523(a)(2)(A) prohibits the discharge of any debt "for money . . . to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." Thus, "[d]ebts attributable to fraud may not be discharged . . . ." *Mayer*, 51 F.3d at 672.

7

"The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" *United States v. Ron Pair Enters.*, 489 U.S. 235, 242 (1989) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)). Under the plain language of Section 523(a)(2)(A), "the 'bankrupt' need not perpetrate the fraud." *In re M.M. Winkler & Assocs.*, 239 F.3d 746, 749 (5th Cir. 2001); *see* 11 U.S.C. § 523(a)(2)(A). That Congress did not require that the bankrupt perpetrate the fraud in Section 523(a)(2)(A) indicates that an innocent partner's debt incurred due to the fraud of his partner is not dischargeable pursuant to Section 523(a)(2)(A).

But does this literal application of Section 523(a)(2)(A) produce a result that is at odds with Congress' intentions? The Court answers this inquiry in the negative because both the history of the fraud exception and congressional policy considerations support this Court's conclusion. The Court addresses each in turn.

In *Strang v. Bradner*, two partners, who neither participated in nor knew about the actual fraud of the third partner, sought a discharge of the debt incurred as a judgment against the partnership. 114 U.S. 555, 556-61 (1885). The Court, interpreting Section 17a(2) of the Bankruptcy Act of 1867, which excepted from discharge a "debt created by the fraud . . . of the bankrupt . . . .", disallowed the discharge. *Id.* The *Strang* Court held that "if, in the conduct of partnership business, . . . one partner makes false or fraudulent misrepresentations of fact to the injury of innocent persons who deal with him as representing the firm, . . . his partners cannot escape pecuniary responsibility therefor upon the ground that such misrepresentations were made without their knowledge." *Id.* at 561.

8

In *McIntyre v. Kavanaugh*, a partner who neither participated in nor knew about his partnership's conversion of another's property, sought a discharge of the debt incurred as a judgment against the partnership. 242 U.S. 138, 140-42 (1916). The Court, interpreting Section 17a(2) of the Bankruptcy Act of 1898, which disallowed discharge of "liabilities for obtaining property by false pretenses or false representations, or for wilful and malicious injuries to the person or property of another," disallowed the discharge. 242 U.S. 138, 140-42 (1916). The Supreme Court, as it did in *Strang*, interpreted Section 17a(2) to effectuate the purpose of the statute. *Id.* at 141-42. The *McIntyre* Court stated "[t]hat partners are individually responsible for torts by a firm when acting within the general scope of its business, whether they personally participate therein or not, we regard as entirely clear." *Id.* at 139. Accordingly, because "the firm inflicted a wilful and malicious injury to property, . . . plaintiff . . . incurred liability for that character of wrong." *Id.* at 139.

In *Cohen v. de la Cruz*, a bankrupt fraud perpetrator argued that "'any debt . . . for money, property, services, or . . . credit, to the extent obtained by' fraud d[id] not include treble damages awarded in a fraud action." 523 U.S. at 218-19. The Court, interpreting Section 523(a)(2)(A), held that "[o]nce it is established that specific money or property has been obtained by fraud . . . any debt arising therefrom is excepted from discharge." *Id.* (quotation omitted). In so holding, the *Cohen* Court relied in part on the legislative history of the fraud exception and stated that: (1) Section 17a(2) of the Bankruptcy Act of 1898 (the precursor to Section 523(a)(2)(A)) prohibited discharge of "judgments in actions for fraud," *id.* at 221; (2) the 1903 amendments broadened the exception to include "liabilities for obtaining property by false pretenses or false representations," *id., see Brown v. Felsen*, 442 U.S. 127, 138 (1979) (stating

9

that the 1903 amendments suggest "that all debts arising out of conduct specified in § 17 should be excepted from discharge"); (3) "the Bankruptcy Act of 1978 enacted a 'substantially similar' provision," 242 U.S. at 221, *see Brown*, 442 U.S. at 129 n.1; and (4) the Bankruptcy Act of 1984 provided merely a "stylistic change," 242 U.S. at 221. Because the legislative history did not indicate Congress' intention to narrow the scope of the fraud exception, the *Cohen* Court rejected the debtor's argument that the debt incurred from treble damages awarded in a fraud action should be discharged.

Given the history of the fraud exception and the Supreme Court's interpretation of Section 523(a)(2)(A), this Court is unwilling to depart from the past bankruptcy practice of disallowing a discharge of an innocent partner's debt that was obtained by his partner's fraud. There is no indication that Congress in enacting the Bankruptcy Reform Act of 1978 intended to legislatively overrule *Strang* or *McIntyre*. *See In re Tsurukawa*, 287 B.R. 515, 525 (B.A.P. 9th Cir. 2002); *see Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 504-06 (1986) (stating that when Congress intends to alter longstanding statutory interpretation, it clearly expresses that intent). Thus, if *Strang* or *McIntyre* are to be overturned or legislatively nullified, such power rests exclusively within the province of the Supreme Court or Congress.

Finally, the policy that underlies the discharge exception supports this Court's conclusion. As the Supreme Court in *Grogan v. Garner* stated:

> The statutory provisions governing nondischargeability reflect a congressional decision to exclude from the general policy of discharge certain categories of debts-such as child support, alimony, and certain unpaid educational loans and taxes, as well as liabilities for fraud. Congress evidently concluded that the creditors' interest in recovering full payment of debts in these categories outweighed the debtors' interest in a complete fresh start.

498 U.S. 279, 287 (1991). In other words, "Section 523(a)(2)(A) is not designed to protect debtors; rather it is designed to protect the victims of fraud." *In re Quinlivan*, 434 F.3d 314, 319 (5th Cir. 2005); *see Mayer*, 51 F.3d at 674 (stating that section 523 serves "vital functions," including fraud prevention, that override the concept of starting over with a clean slate); *see id.* (citing Thomas H. Jackson, *The Logic and Limits of Bankruptcy Law* 273-79 (1986) (identifying restrictions on the fresh-start policy)). Accordingly, courts "must respect [Congress'] judgment." *Mayer*, 51 F.3d at 674. In addition, "[h]olding the debtor accountable for his partner's fraud 'effectuates important state law policies regarding imputed liability.'" *In re Quinlivan*, 434 F.3d at 319 (quoting *In re M.M. Winkler*, 239 F.3d at 751)). These policies "create incentives for the debtor to control or monitor the conduct of his agent or partner." *Id.*

The policies underlying Section 523(a)(2)(A) teach that Casablanca's interest in recovering full payment of debts arising from Abrham's partner's fraud outweighs Abrham's interest in obtaining a fresh start. As between Abrham and Casablanca, Abrham was in the better position to have ordered his affairs to prevent DWG's fraud, and the congressional policy behind Section 523(a)(2)(A) is meant to discourage a partner from taking an "ostrich" approach with regard to monitoring another partner's activities. This is especially true because there were only three partners in the GC Team.

Therefore, based on the plain language of Section 523(a)(2)(A), the history of the fraud exception and Congress' policies underlying the exception, the Court holds that an innocent partner's debt for money to the extent obtained by the actual fraud of one of his two other partners is not dischargeable under Section 523(a)(2)(A). The Court therefore concludes that the

11

bankruptcy court correctly imputed DWG's fraud to Abrham such that his debt arising from Casablanca's judgment against him is nondischargeable.

Next, Abrham argues that the bankruptcy court erred in (1) failing to determine that the fraudulent conduct of a partner can only be imputed to an innocent partner if the innocent partner received some benefit from the fraud; (2) holding that Abrham benefitted from DWG's fraud; and (3) finding that there was no genuine issue of material fact as to whether Abrham received a benefit from DWG's fraud. The Court disagrees.

As did the bankruptcy court, the Court notes that there is a circuit split regarding whether and to what extent courts should require that the debtor personally receive money in order to disallow a discharge under Section 523(a)(2)(A). *Compare In re M.M. Winkler*, 239 F.3d at 751 (rejecting a "receipt of benefits" requirement and holding that an innocent partner's debt was nondischargeable regardless of whether the innocent partner received any benefit from his partner's fraud), *and In re Malget*, 165 B.R. 933 (Bankr. S.D. Cal. 1994) (same), *with In re Bilzerian*, 100 F.3d 886, 889 (11th Cir. 1996) (holding that fraudulent debtor's indirectly benefitting from creditor's investment in debtor's business venture satisfies the requirement), *In re Ledford*, 970 F.2d 1556, 1561-62 (6th Cir. 1992) (holding that innocent partner's sharing in the monetary benefits of partnership funds generated by his partner's fraud satisfied the requirement), *In re Ashley*, 903 F.2d 599, 604 (9th Cir. 1990) (holding that placing oneself "in a position to benefit from any infusion of capital to th[e] enterprise" was sufficient to satisfy the requirement).

However, it is unnecessary for the Court to choose sides because even under the most stringent standard, the debt is not dischargeable. *See Mayer*, 51 F.3d at 675 ("We do not create

12

conflicts among the circuits without strong cause. A conflict here would be gratuitous.") It is undisputed that Abrham, DWG and Hernandez entered a formal partnership agreement as the GC Team for the purpose of constructing the project at issue, and the GC Team equally shared $60,000.00 of the $385,000.00 deposit that Casablanca paid to the partnership as its down payment[2] without disclosing to Casablanca that it was being used to pay the GC Team partners. (R., Attach. 1, Doc. 1-1, at 72.) Further, DWG fraudulently represented that the $385,000.00 deposit was, in part, for a deposit on hardwood flooring and an elevator and to pay a demolition subcontractor, when, in fact, no deposit was ever made on either hardwood flooring or an elevator. (*Id.* at 75.) Because (1) the arbitration panel found that DWG committed fraud in representing how the $385,000.00 deposit would be utilized; (2) the arbitration panel found that Abrham received $20,000.00 of the deposit and had the right to share equally in the profits of the partnership; (3) Casablanca and Abrham have stipulated that the arbitration panel's findings of fact and conclusions of law govern in this case, the Court holds that the bankruptcy court correctly concluded that, regardless of the standard it applied, there was no genuine issue of material fact for trial as to this issue.

## Conclusion

---

[2] Abrham argues that because the arbitration panel found that the fraud occurred after the Agreement was signed, his receipt of $20,000.00 from the deposit does not show that he benefitted from the fraud. However, the arbitration panel stated that DWG's fraud included its misrepresentations as to how the deposit would be spent. (R., Attach. 1, Doc. 1-1, at 75.) The panel also noted that DWG failed to disclose to Casablanca that $60,000.00 of the deposit was used to pay the partners of the GC Team, *i.e.*, Abrham, DWG and Hernandez. (*Id.* at 72.)

For the foregoing reasons, the Court affirms the order of the bankruptcy court granting Casablanca's motion for summary judgment and denying Abrham's motion for summary judgment. This case is hereby terminated.

**SO ORDERED.**                                **ENTERED:**

**August 30, 2010**

_____
**RONALD A. GUZMAN**
**United States District Judge**